IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

CRACKER BARREL OLD COUNTRY STORE,
INC.

              Plaintiff,

vs.

CINCINNATI INSURANCE COMPANY,

              Defendant.

No: 3-07-303
Judge John T. Nixon
Magistrate Judge John S. Bryant

## PLAINTIFF CRACKER BARREL'S POST-HEARING MEMORANDUM ON CINCINNATI'S DUTY TO DEFEND

Plaintiff Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") respectfully submits this post-hearing memorandum of law following the October 29, 2010 hearing before the Court (the "Hearing"), and in further support of its motion for partial summary judgment seeking a declaration from this Court that Defendant, The Cincinnati Insurance Company ("Cincinnati"), has a contractual obligation to reimburse Cracker Barrel for certain defense costs incurred in connection with an action brought against Cracker Barrel by the United States Equal Employment Opportunity Commission (the "EEOC Lawsuit"). Cracker Barrel incorporates by reference herein the arguments and evidence submitted in support of its Motion for Partial Summary Judgment on Defense Costs (Doc. 94), in Opposition to Defendant's Motion for Summary Judgment (Doc. 157), and in Opposition to Defendant's Motion to Bar the Expert Testimony of Donald W. Bendure. (Doc. 125).

## Introduction

As this Court is aware, this is a straightforward matter of a policyholder seeking payment of defense costs to which it is entitled, as these costs arose from a lawsuit that included at least one covered claim which Cincinnati has admitted occurred during its policy period. The insurance policies sold by Cincinnati (the "Policies") specifically provide employment practices liability insurance ("EPLI") coverage, including defense and indemnity, for lawsuits and allegations of the type brought by the EEOC. Cracker Barrel paid considerable premiums to Cincinnati for the Policies and, from June 1, 2000 through August 31, 2004, Cracker Barrel's EPLI coverage remained in full force and effect.

Despite its clear contractual obligations, Cincinnati repeatedly denied any duty to defend or indemnify Cracker Barrel in connection with the EEOC Lawsuit. Cracker Barrel was forced to defend itself independently against the EEOC Lawsuit, which Cracker Barrel eventually settled on March 8, 2006 for $2 million while incurring total defense costs in excess of nearly $800,000.

At the Hearing before this Court on October 29, 2010, Cracker Barrel and Cincinnati presented their arguments regarding Cincinnati's duty to defend and Cincinnati's present obligation to reimburse Cracker Barrel for the defense costs it incurred in the EEOC Lawsuit. Rather than acknowledge well-settled law or the clear terms of the Policies, Cincinnati's arguments continue to point to an alleged outside "agreement" which purportedly somehow removed Cincinnati's duty to defend from the Policies. Cincinnati also reiterated the same contradictory, alternative arguments that strain the interpretation of express and uncontroverted policy language. Belying Cincinnati's avalanche of papers submitted to this Court and logic-bending arguments is

the simple premise that Valerie Sucich's charge of discrimination – which Cincinnati itself has admitted is a covered claim under the policy, and which is clearly encompassed within the EEOC Lawsuit – is undeniably the one "potentially covered claim" that sufficiently meets the requirements of Tennessee law to trigger Cincinnati's duty to defend.

## ARGUMENT

Under the law of Tennessee and the clear terms of the Cincinnati Policies, there is no legal or factual basis to deny Cracker Barrel its right to reimbursement from Cincinnati of the defense costs expended during the EEOC Lawsuit.

## I.    CINCINNATI'S POLICIES CONTAIN A CLEAR DUTY TO DEFEND

The Cincinnati Policies – the terms of which are uncontroverted – clearly state that Cincinnati has "a duty to defend" "any 'claim' first made during the 'policy period'." Zylstra Decl., Exh. A, Part II, Section I.[1]  In the Policies' basic insuring agreement, Cincinnati promises to:

> pay on behalf of the "insureds" **all "loss"** which they shall be legally obligated to pay **resulting from any "claim" first made during the "policy period"**, or any "extended reporting period" included in or endorsed to the policy, **for a "wrongful act"**.  [Cincinnati] will have the right and **duty to defend** the "insureds" against any such "claim".  Zylstra Decl., Exh. A, Part II, Section I (emphasis added).

Taking each portion of this Cincinnati contractual promise in turn:

- The definition of "loss" includes defense costs.  Zylstra Decl., Exh. A, Part II, Section V(F).  Thus, Cincinnati's promise is to pay Cracker Barrel's defense costs resulting from claims "first made during the policy period."

---

[1] "Zylstra Decl." refers to the Declaration of Michael Zylstra, dated March 3, 2009, and filed in support of Cracker Barrel's motion for partial summary judgment (Doc. 96).

Case 3:07-cv-00303   Document 176   Filed 12/03/10   Page 3 of 16 PageID #: 7680

- The Policies require Cincinnati to pay for "all loss" that Cracker Barrel becomes legally obligated to pay, but only as a result of any claim first made during the policy period for wrongful acts occurring during any one of the Policies' periods of coverage. Thus, Cincinnati's payment obligation for lawsuits, such as the EEOC Lawsuit, cannot look back to claims that were first made before the policy period, such as the nine original charges filed before the June 1, 2000 retroactive date. Rather, under the clear language of the insuring agreement, Cincinnati must pay Cracker Barrel's defense costs resulting from claims first made during the policy period. As argued in Cracker Barrel's moving papers on its motion for partial summary judgment, the claim made by Valerie Sucich was the first claim made during the policy period. This conclusion is required by Cincinnati's own policy language.[2]

- Finally, stated in clear, unambiguous language within Cincinnati's contractual promise of coverage to Cracker Barrel is that Cincinnati will have a "duty to defend" Cracker Barrel for claims first made during the policy period.

Accordingly, for purposes of deciding whether Cincinnati has an obligation to pay Cracker Barrel's defense costs for the EEOC Lawsuit, which indisputably includes at least one claim first made during the Cincinnati policy periods, the language of the Cincinnati Policies clearly dictates that such an obligation exists.

Ignoring the clear language of the insurance policy, Cincinnati's argues that an alleged – though completely unsubstantiated – "agreement" existed between Cracker Barrel and Cincinnati that purportedly somehow removed any defense obligation from the Policies without altering their express terms. Cincinnati's argument is blatantly false

---

[2] Cincinnati admits it to be "undisputed . . . that a charge of discrimination is a claim under the Cincinnati policy." Transcript of Proceedings, dated October 19, 2010 ("Hearing Tr."), excerpts of which are attached hereto as Exh. 1, at 26:24-27:1. Cincinnati further admits that the date on which the Sucich claim is deemed to have occurred is the date when the Charge of Discrimination was first received by Cracker Barrel. Cincinnati Opposition at 15. Further proof that the Sucich claim was the first claim made during the Cincinnati policy period is found in the Declarations page of the Policies, which clearly states that "[t]he insurance is limited to 'wrongful acts' **for which 'claims' are first made** against the 'policy insureds' **during the 'policy period.'"** Zylstra Decl., Exh. A (emphasis added).

as Cracker Barrel never agreed that Cincinnati did not have a duty to defend under the EPLI Policies.

First, it is improper and unacceptable for an insurance company to assert that an outside agreement voids direct terms of its policies – particularly terms as essential and economically central to the policy as the duty to defend – while at the same time **not** endorsing the policy to change its terms. No such change to the policy was made because there was no such agreement. As explained by Cracker Barrel's counsel at the Hearing:

> With regard to Cincinnati's bald assertion that somehow the defense obligation was eliminated out of these insurance policies, there is no endorsement in the policy that eliminates it. There is no writing from Cracker Barrel that says the defense obligation was eliminated, and frankly, there was no refund of premium. If what they really meant was we are not going to provide one of the major bases for buying this insurance, there should have been a refund of insurance premiums. There wasn't.

Hearing Tr. 16:4-13.

Moreover, when convenient, Cincinnati adamantly states that this Court may **not** look beyond the terms of the Policies. In attempting to refute a March 2000 letter written by a Cincinnati Assistant Vice President harmful to Cincinnati's position, Cincinnati admonishes: "That letter does not constitute the terms of the Cincinnati policy. . . . The policy contains an integration clause at Part 4, Section 15 which states that the policy constitutes the entire agreement between the parties." Hearing Tr. at 33:11-17.[3] Cincinnati cannot have it both ways.

_____

[3] Cincinnati counsel goes on to tell the Court that "[th]e point is, that letter was written before the policy issued and accepting Cracker Barrel's argument **would rewrite this policy, which, as this Court is aware, is not allowed under Tennessee law.**" Hearing Tr. at 34:4-8 (emphasis added).

Case 3:07-cv-00303  Document 176  Filed 12/03/10  Page 5 of 16 PageID #: 7682

Finally, even if there were an agreement between the parties giving Cracker Barrel the right to control the defense of claims against it, any such agreement only would apply until the point at which a claim reached the deductible (or for class actions), at which point Cincinnati's obligation was triggered. Therefore, Cincinnati's argument regarding the purported "elimination" of the duty to defend is wholly without merit.

## II. CINCINNATI HAS A CLEAR DUTY TO DEFEND THE EEOC LAWSUIT UNDER TENNESSEE LAW

Under Tennessee law, an insurance company's duty to defend is a separate obligation from any duty to pay claims under a policy. *Drexel Chem. Co. v. Bituminous Ins. Co.*, 933 S.W.2d 471, 480 (Tenn. Ct. App. 1996); *Planet Rock, Inc. v. Regis Ins. Co.*, 6 S.W.3d 484, 491 (Tenn. Ct. App. 1999) (citing *Drexel*). It is well-settled that the duty to defend is broader than the duty to indemnify, as the duty to defend is based merely on the facts alleged. *Travelers Indem. Co. of America v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007). The issue being examined in assessing the duty is "whether any loss suffered is within the risk contemplated by the terms of the insurance contract." *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 833 (Tenn. 1994). In determining the duty to defend, a court must review the allegations within the complaint and determine if they sufficiently state a claim under the policy. *Travelers Indem. Co.*, 216 S.W.3d at 305; *Drexel*, 933 S.W.2d at 480.

In *Drexel*, the Court noted that where the duty to defend is at issue:

> If **even one** of the allegations is covered by the policy, the insurer has a duty to defend, irrespective of the number of allegations that may be excluded by the policy.... An insurer may not properly refuse to defend an action against its insured unless "it is plain from the face of the complaint that the allegations fail to state facts that bring the case within **or potentially within** the policy's coverage."

Case 3:07-cv-00303   Document 176   Filed 12/03/10   Page 6 of 16 PageID #: 7683

*Id.* (quoting *Glens Falls Ins. Co. v. Happy Day Laundry, Inc.*, 1989 WL 91082 (Tenn. Ct. App. Aug. 14, 1989)) (emphasis added) (Doc. 157, Appendix 3). *See also Insura Prop. & Cas. Ins. Co. v. Ashe*, No. M2002-00374-COA-R3-CV, 2003 WL 253255, at *3 (Tenn. Ct. App. Feb. 6, 2003) (Doc. 157, Appendix 2). Thus, if there was even a single claim asserted against Cracker Barrel that could potentially fall within the coverage provided by the Policies, Cincinnati breached its duty to defend by failing to provide a defense. *Drexel*, 933 S.W.2d at 480.

The determination of an insurance company's duty to defend begins and ends with the four corners of the complaint. *Smith & Nephew Inc. v. Federal Ins. Co.*, 113 F. App'x 99, 102 (6th Cir. 2004). Should any perceived ambiguity in the allegations cause doubt as to their sufficiency, that doubt must be resolved in favor of the policyholder. *Travelers Indem. Co.*, 216 S.W.3d at 305 (citing *Dempster Bros., Inc. v. United States Fid. & Guar. Co.*, 388 S.W.2d 153, 154-56 (Tenn. Ct. App. 1964)). Under this standard, at a bare minimum Cincinnati's duty arose when Cracker Barrel first received a claim for wrongful acts within the Policy period. Here, it is uncontroverted and admitted by Cincinnati, that first claim was the Notice of Charge filed with the EEOC by Valerie Sucich. Applying this standard to the allegations brought against Cracker Barrel in the EEOC Lawsuit, which included the Sucich claim, there can be no doubt that even a cursory reading of the EEOC complaint shows that the claims against Cracker Barrel are potentially covered. Therefore, it is clear that Cracker Barrel is entitled, as a matter of law, to reimbursement of defense costs incurred as a result of the EEOC Lawsuit.

Indeed, Cincinnati never denies the central premise that there are covered claims making up at least part of the EEOC Lawsuit for wrongful acts that occurred and were

noticed to Cincinnati during the Cincinnati policy periods. This is the sole issue that the

Court need consider for purposes of deciding Cracker Barrel's summary judgment

motion and determining whether Cincinnati is obligated to reimburse Cracker Barrel for

certain defense costs incurred in the EEOC Lawsuit.

## III. NONE OF CINCINNATI'S CONTRADICTORY AND ALTERNATIVE DEFENSES ALLEVIATE ITS OBLIGATION TO DEFEND

Cincinnati raises several arguments based on strained interpretations of its policy

language, none of which change the fact that the EEOC Lawsuit includes claims first

made and noticed during the policy period for wrongful acts committed during the policy

period. Further, these arguments are inherently contradictory, as shown through

Cincinnati's several admissions over the course of the Hearing on this issue.

### A. Cincinnati's Contention that the EEOC Lawsuit is Not a Claim Is Contradicted by Cincinnati's Own Admissions

The Policies define certain key terms:

- "Claim," as defined in the Policies, means "a civil, administrative or arbitration proceeding commenced by the service of a complaint or charge, which is brought by any past, present or prospective 'employee(s)' of the 'insured entity' against any 'insured'" for various wrongful employment practices enumerated in the definitions. Zylstra Decl., Exh. A, Part II, Section V(B).

- "Wrongful act" is defined as "[a]ny actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted **on or after the Retroactive Date . . . and prior to the end of the 'policy period'** by an 'insured' . . .' Zylstra Decl., Exh. A, Part II, Section V(I) (emphasis added).

Under these definitions, the Policies cover losses for claims reported to

Cincinnati during a policy period for wrongful acts occurring during a policy period. A

claim is considered first made when notice of a wrongful act is first given. Zylstra Decl.,

Exh. A, Part IV, Section V.

On the one hand, Cincinnati contends that the EEOC Lawsuit is not a "claim" as defined in the Policies because it was not brought by a Cracker Barrel employee. While true that the EEOC has never been a Cracker Barrel employee, this is not required by the Policies, which define a "claim" as:

> a civil, administrative or arbitration proceeding commenced by the service of a complaint or charge, which is brought by any past, present or prospective 'employee(s)' of the 'insured entity' against any 'insured'. Zylstra Decl., Exh. A, Part II, Section V(B).

As drafted by Cincinnati, the definition of "claim" in the Policies does not require a **proceeding** brought by an employee, but merely that the proceeding ultimately arises out of a complaint **or charge** brought by an employee, which Cincinnati admits is the case here. Cincinnati has explicitly acknowledged that the EEOC Lawsuit "emanates" from prior Charges of Discrimination brought by Cracker Barrel employees. Cincinnati Opposition at 12-16; Hearing Tr. at 27:1-3. Moreover, Cincinnati's interpretation of the definition of "claim" not only conflicts with its own drafting, but also flies in the face of common sense. Cracker Barrel bought EPLI coverage to protect itself from the precise type of liabilities that result from actions by the EEOC – that is the very purpose of this coverage.

Cincinnati made several express admissions at the Hearing supporting Cracker Barrel's position on this argument. First, Cincinnati acknowledged that the EEOC Lawsuit was an administrative proceeding, thereby directly tying the EEOC Lawsuit into the Policies' definition of claim. *See* Hearing Tr. at 35:25-36:1 ("The EEOC brought an administrative action."). Second, Cincinnati admitted that the EEOC Lawsuit was a claim, stating that "If the EEOC had filed its lawsuit between June 1, 2000, and August

1, 2004, if they had filed their Complaint at that time, then we wouldn't be here today."

Hearing Tr. at 20:10-13.[4]

### B. Cincinnati Misinterprets the Clear Language of Its Own Interrelated Wrongful Acts Policy Provision by Arguing that the EEOC Lawsuit Was Not Made During the Policy Period

Cincinnati argues that even if the EEOC Lawsuit is a claim (which it is and which Cincinnati admits), it was not a claim made during the policy period because it was not filed until August 11, 2004, ten days after the last Cincinnati policy expired. Cincinnati is incorrect.

It is often the case with claims-made policies that policyholders will provide notice of any and all pending or potential claims prior to the end of a policy period because they otherwise risk losing coverage for such claims. This is particularly true where, as here, the policyholder was switching insurance companies. The notice to the former insurance company protects the policyholder if and when any of the noticed claims grows into or becomes part of an actual litigation after the expiration of the policy period. As such, Cincinnati is well aware that the EEOC Lawsuit, although filed after August 1, 2004, is comprised of claims first made and noticed to Cincinnati during the Cincinnati policy period. Thus, the EEOC Lawsuit relates back to such claims and is itself a claim under the terms of the Cincinnati Policies (specifically, the "interrelated wrongful acts" provision).

---

[4] Indeed, Cincinnati refers repeatedly to the EEOC Lawsuit as a claim throughout the Hearing. *See, e.g.*, Hearing Tr. at 24, 25, 34 ("Pursuant to the policy terms, the EEOC Complaint, that claim, was first made after the policy expired."); ("on its face that claim was not made until it was served on Cracker Barrel, which is September 19, 2004"); ("This policy is a claims-made policy … clearly it loses when you look at when the EEOC lawsuit, that claim was made."); ("clearly this claim was not made during the June 1, 2000 to August 1, 2004 policy period.").

Cincinnati's argument that the "interrelated wrongful acts" provision should apply to relate the EEOC Lawsuit back to the nine original claims that were first made **before** the inception of the Cincinnati Policies is contrary to the language of the Policies, whose Declarations page clearly states that:

> The insurance is **limited to 'wrongful acts' for which 'claims' are first made** against the 'policy insureds' **during the 'policy period.'"** Zylstra Decl., Exh. A, Declarations (emphasis added).

The same limitation on the category of "claims" for which Cincinnati promised to pay Cracker Barrel's defense costs – that such claims must be **first made during** the policy period – is present with respect to the category of "wrongful acts," and thus, "interrelated wrongful acts." This is the Policy language drafted by Cincinnati, which could not be clearer, and leaves no need to consider anything outside the policy language. The Policies thus limit the application of the "interrelated wrongful acts" provision to a relation back to "wrongful acts" for which "claims" are **first made during** the policy period. There is no question that the Sucich claim is the first claim made during the policy period, and that the EEOC Lawsuit thus relates back to the Sucich claim.

The Policies also specifically state that "all 'claims' based upon or arising out of the same 'wrongful act' or any 'interrelated wrongful acts' shall be considered a single 'claim.'" Zylstra Decl., Exh. A, Part IV, Section II(E). Internal Cincinnati correspondence further indicates that this provision was not meant to eliminate coverage for claims that may be tied to wrongful acts occurring prior to inception, but that "coverage would be for forward acts for all Wrongful or interrelated Acts that were known prior to the inception date of this cover." Zylstra Decl., Exh. N.

## C. Cincinnati's Notice-Based Defenses Also Must Fail

Cincinnati raises various notice-based defenses, none of which apply here. Cincinnati admits that the Sucich claim was first made during the Cincinnati policy period. Through the Declaration of Dennis Stetz in support of Cincinnati's Opposition, Cincinnati admits to not wanting to receive notice from Cracker Barrel of claims unless and until they could potentially exceed the deductible of the Cincinnati Policies (Doc. 108, ¶5). Cincinnati admits to receiving notice of the Sucich claim in July of 2004, but argues that this notice was irrelevant. Cincinnati Opposition at 24. To the contrary, as detailed above, such notice often is given at the end of a policy period to protect the policyholder in the event that the claim results in a subsequent litigation – precisely what happened here with the EEOC Lawsuit. At the Hearing, Cracker Barrel counsel explained:

> So what Cracker Barrel did was it had a wrongful act which took place during the policy period, it had a claim in the Notice of Charge which took place during the policy period, it gave notice during the policy period. And then a lawsuit happened ten days after the end of the Cincinnati policy period. This Notice, Exhibit G, was explicitly designed to anchor the existing matters into the Cincinnati policy period. That is what it's for. The policy is designed that way. The policy actually has a provision in it.

> \* \* \*

> And that policy actually contains a provision which permits exactly this type of notice. So even though the Cincinnati policy period had already ended, the policy by its own terms permitted the anchoring of these claims in it. It is exactly what Cracker Barrel did.

Hearing Tr. at 11:14-12:5.

Thus, Cincinnati: (a) had notice of claims that were part and parcel of the EEOC Lawsuit as of July 2004; and (b) received notice of the EEOC Lawsuit (which was not a class action) from Cracker Barrel at a time well before the defense costs approached

the relevant deductible, but when Cracker Barrel first reasonably believed that they might eventually reach that threshold.

In sum, and as aptly put by counsel for Cracker Barrel at the Hearing when describing Cincinnati's many inconsistent, alternative defenses: "the way that they argue in their briefs, ... it's virtually impossible to get a claim within their policy period ... Cincinnati just doesn't want to pay. And that is really what this is about, Your Honor. This is about Cincinnati saying, well, the claim was either early or the claim was late or it's not a claim at all and the notice you give doesn't mean anything." Hearing Tr. 17:1-15.

## IV.  CRACKER BARREL'S EXPERT WITNESS WILL PROVIDE RELEVANT RELIABLE TESTIMONY

After Cracker Barrel sought leave with this Court to file the report of its expert witness, Donald W. Bendure (Doc. 119-1), Cincinnati made a motion to strike the expert testimony. (Doc. 121, 122) This Court held at the Hearing that the expert testimony would be allowed pending a further response or motion to strike from Cincinnati in its post-hearing briefing.[5] Following the Hearing, Cincinnati took the deposition of Mr. Bendure. As evidenced by Mr. Bendure's deposition testimony, Mr. Bendure will provide relevant, reliable testimony that will assist the trier of fact in understanding and determining Cincinnati's duty to defend as that duty is understood by the insurance industry and by the explicit terms of the Policies here.

---

[5] While Cincinnati made clear that it would respond to the expert report in its post-hearing briefing, it is not clear what the scope of Cincinnati's response will be. Cracker Barrel reserves the right to seek leave to file a response brief should Cincinnati raise any new argument not previously raised with regard to Cracker Barrel's expert witness, or any other issue relevant to the summary judgment motions pending before the Court.

First, any renewed argument by Cincinnati that Mr. Bendure is not qualified to opine on the issues discussed in his report is overwhelmingly refuted by the testimony provided at his November 19, 2010 deposition. Indeed, Cincinnati counsel spent the first several hours of deposition painstakingly going over Mr. Bendure's vast experience and qualifications, which included time spent working for insurance companies in both an underwriting and claims consulting capacity, as well as personally drafting endorsements for employment practices liability coverage. *See, e.g.,* Deposition Transcript of Donald Bendure, dated November 19, 2010 ("Bendure Tr."), attached hereto as Exh. 2, at 42-51, 57-65, 74.

Second, Mr. Bendure confirmed through his testimony each of the main points addressed in his report. Specifically, Mr. Bendure pointed to particular provisions of the Policies including the Insuring Agreement and the "interrelated wrongful acts" provision to confirm that it was his opinion that not only are the Cincinnati Policies "duty to defend" policies, but that the EEOC Lawsuit related back to the Sucich charge of discrimination, thereby triggering Cincinnati's duty to defend upon notice of the claim, and presently obligating Cincinnati to reimburse Cracker Barrel for the defense costs incurred. *See, e.g.,* Bendure Tr. at 107:25-108:6; 136-38, 172-73, 185.

Finally, Mr. Bendure's testimony provides helpful explanation and insight into industry standards and norms regarding the function of a policy deductible as distinguished from a self-insured retention. This testimony is particularly relevant here given Cincinnati's assertions regarding the alleged "agreement" it had with Cracker Barrel regarding defense of the employment discrimination claim. Mr. Bendure explained that it was not uncommon for a policyholder to control the initial defense of a

claim where the policy has a very large deductible, similar to that present in the Policies, but the policyholder's control of that defense in no way eliminates the insurance company's contractual obligation to defend once its layer is reached. *See, e.g.*, Bendure Tr. at 111-124.

Tellingly, in direct response to a question from the Court asking what Cracker Barrel was paying for if not for defense coverage, Cincinnati counsel responded: "Well, they got a lot in exchange. Rather than Cincinnati controlling the defense of their employment discrimination lawsuits, Cracker Barrel got the right to control the defense, which apparently was an important right to Cracker Barrel. It got the right to choose its own counsel and control that defense." Hearing Tr. at 39:17-23. Cincinnati argues that because it "lost" that right, it had no duty to defend the EEOC lawsuit. *Id.* at 40. As explained herein, in prior briefing, at the Hearing, and further bolstered by Mr. Bendure's expert reading of the Policies and industry knowledge, that is simply not how liability insurance policies function.

## CONCLUSION

For the foregoing reasons and those previously argued at the Hearing, and based on all the evidence presented and the submissions proffered, Plaintiff Cracker Barrel respectfully requests that this Court enter an order (i) granting Plaintiff's motion for partial summary judgment declaring that Defendant Cincinnati Insurance Company breached its contractual duty to defend Cracker Barrel and now has an obligation to reimburse Cracker Barrel for defense costs incurred in defending the EEOC Lawsuit, (ii) denying Cincinnati's motion for summary judgment, and (iii) for such other and further relief as this Court deems just and proper.

Dated:  December 3, 2010

Respectfully submitted,

ANDERSON, KILL & OLICK, P.C.

By:   /s/ Cort T. Malone
_____
William G. Passannante
Cort T. Malone
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 278-1000

John A. Day
Day & Blair, P.C.
5300 Maryland Way, Suite 300
Brentwood, TN 37027
Telephone: (615) 742-4880
Facsimile: (615) 742-4881

Attorneys for Plaintiff
Cracker Barrel Old Country Store, Inc.